# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| **ex rel. DONALD GALE,** | ) | |
| | ) | **Case No. 1:10-CV-0127** |
| **Plaintiff and Relator,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Judge Boyko** |
| **OMNICARE, INC.,** | ) | |
| | ) | **Mag. Judge McHargh** |
| **Defendant.** | ) | |

## MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6), 12(b)(1) AND 9(b)

FREDERICK M. MORGAN, JR. (OH 0027687)
JENNIFER M. VERKAMP (OH 0067198)
MORGAN VERKAMP, LLC
700 Walnut Street, Suite 400
Cincinnati, Ohio 45202
513-651-4400
513-651-4405 (fax)
rick.morgan@morganverkamp.com
jverkamp@morganverkamp.com

ROSS B. BROOKS (NY 3001146) (admitted *pro hac vice*)
MILBERG LLP
One Pennsylvania Plaza, 49th Floor
New York, New York 10119
212-946-9465
212-868-1229 (fax)

rbrooks@milberg.com

VIRGINIA A. DAVIDSON (OH 0025773)
ERIC S. ZELL (OH 0084318)
CALFEE, HALTER & GRISWOLD LLP
1405 East Sixth Street
Cleveland, Ohio 44114
216-622-8200
216-241-0816 (fax)
vdavidson@calfee.com
ezell@calfee.com

*Attorneys for Plaintiff-Relator Donald Gale*

## Table of Contents

*Page(s)*

**STATEMENT OF ISSUES TO BE DECIDED** ……………………………………………1

**SUMMARY OF ARGUMENT** …………………………………………………………1

**INTRODUCTION** ……………………………………………………………………… 2

**FACTS** ………………………………………………………………………………2

**ARGUMENT** ………………………………………………………………………… 4

**I.      THE COURT HAS JURISDICTION** …………………………………………… 4

**II.     MR. GALE'S COMPLAINT STATES A CLAIM FOR
         RELIEF UNDER THE FCA** ………………………………………………………6

      1.   Relator sufficiently pleads that Omnicare's swapping arrangements result in illegal
              remuneration to its SNF customers. …………………………………………..…8

      2.   Relator has pleaded that "a purpose" of Omnicare's remuneration is to induce
              referrals. …………………………………………………………………………10

      3.   Relator adequately pleads allegations that Omnicare acted with the requisite
              intent …………………………………………………………………………16

**III.    THE COMPLAINT SATISFIES RULE 9(B)'S PARTICULARITY
         REQUIREMENT** ………………………………………………………………18

      1.   Rule 9(b) requires fair notice to the Defendant of Relator's claims—not the pleading
              of evidence. ……………………………………………………………………18

      2.   Leave to Amend …………………………………………………………………23

**IV.     THE COMPLAINT PROPERLY PLEADS THAT OMNICARE'S SWAPPING
         CONTRACTS RESULTED IN THE SUBMISSION OF FALSE CLAIMS TO STATE
         MEDICAID PROGRAMS** ………………………………………………………..23

**CONCLUSION** ………………………………………………………………………25

## Table of Authorities

***Case***                                                                                                 ***Page(s)***

*Am. Lith. Soc. v. Thompson*, 215 F. Supp.2d 23 (D.D.C. 2002)  .................................................. 15

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009)  ....................................................................................... 4

*Bell Atl. Corp. v. Twombly*, 550 U.S. 554 (2007) ....................................................................... 4,16

*Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 2011 FED App. 0203P
    (6th Cir. 2011) ............................................................................................................................ 4

*Cook Count. v. U.S. ex rel. Chandler*, 538 U.S. 119 (2003)  ....................................................... 18

*Ebeid v. Lungwitz*, 616 F.3d 993 (9th Cir. 2010), *cert. denied,* 131 S.Ct. 801 (2010) ................... 20

*Golden v. City of Columbus*, 404 F.3d 950 (6th Cir. 2005)  ......................................................... 10

*Michaels Building Co. v. Ameritrust Co., N.A.,*
    848 F.2d 674 (6th Cir. 1988) ............................................................................................... 18,19

*Omnicare Respiratory Services v. ODJFS*, 2010 Ohio 625,
    2010 Ohio App. LEXIS 516 (App. Franklin Cty., February 23, 2010)  ....................... 5,24 ,25

*U.S. v. Bay State Ambulance & Hosp. Rental Serv., Inc.*
    874 F.2d 20 (1st Cir. 1989)  ................................................................................................10-11

*U.S. v. Greber*, 760 F.2d 68 (3d Cir. 1985) .............................................................................. 11

*U.S. v. Guy*, 2006 U.S. Dist. LEXIS 46053 (N.D. Ohio, July 7, 2006) ....................................... 19

*U.S. v. Lipkis*, 770 F.2d 1447 (9th Cir. 1985)  ............................................................................ 15

*U.S. v. Neifert-White Co.*, 390 U.S. 228 (1968)  ........................................................................ 18

*U.S. v. Rogan*, 459 F. Supp. 2d 692 (N.D. Ill. 2006),
    *aff'd* 517 F.3d 449 (7th Cir. 2008) .................................................................................... 6,7,16

*U.S. v. Shaw*, 106 F. Supp. 2d 103 (D. Mass. 2000)  ................................................................. 16

*U.S. ex rel. Bledsoe v. Cmty. Health Sys.*
342 F.3d 634 (6th Cir. 2003) ................................................................................................... 23

*U.S. ex rel. Bledsoe v. Cmty. Health Sys.,*
    501 F.3d 493 (6th Cir. Tenn. 2007) ......................................................................................... 4

*U.S. ex rel. Cox v. Smith & Nephew, Inc.*,
749 F. Supp. 2d 773 (W.D. Tenn. 2010) ............................................................ 19

*U.S. ex rel. Dingle v. Bioport Corp.*, 388 F.3d 209, 215 (6th Cir. 2004),
*cert. denied*, 544 U.S. 949 (2004) ...................................................................... 6

*U.S. ex rel. Duxbury v.Ortho Biotech Prods., Inc.*,
579 F.3d 13 (1st Cir. 2009), *cert. denied*, 130 S. Ct. 3454 (2010) ...................... 20

*U.S. ex rel. Fine v. Sandia Corp.*, 70 F.3d 568 (10th Cir. 1995) .................................. 6

*U.S. ex rel. Folliard v. CDW Tech. Svcs*, 722 F. Supp.2d 20 (D.D.C. 2010) .............................. 20

*U.S. ex rel. Fry v. The Health Alliance of Greater Cincinnati*,
2008 U.S. Dist. LEXIS 102411(S.D. Ohio Dec. 2008) .......................................7,8,9,18-19,20

*U.S. ex rel. Grubbs v. Kanneganti*,  565 F.3d 180 (5th Cir. 2009)  ......................... 18,20

*U.S. ex rel. Hutcheson v. Blackstone Medical, Inc.*,
647 F.3d 377 (1st Cir. 2011)  ........................................................................... 6

*U.S. ex rel. Lane v. Murfreesboro Derm. Clin., PLC*,
2010 U.S. Dist. LEXIS 46847 (M.D. Tenn. 2010)  .............................................. 19

*U.S. ex rel. Lemmon v. Envirocare, Inc.*,
614 F.3d 1163 (10th Cir. 2010) ....................................................................... 20

*U.S. ex rel. Lisitza v. Johnson & Johnson*,
765 F. Supp. 2d 112 (D. Mass. 2011)  ................................................................ 7

*U.S. ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849 (7th Cir. 2009)  ....................... 20

*U.S. ex rel. McDonough v. Symphony Diagnostic Servs., Inc.*,
2011 U.S. Dist. LEXIS 153583 (S.D. Ohio, February 27, 2012) .................. 8,9,12,19, 21, 22

*U.S. ex rel. Obert-Hong v. Advocate Health Care, et al*,
211 F. Supp. 2d 1045 (N.D. Ill 2002)  ............................................................14-15

*U.S. ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*,
565 F. Supp. 2d 153 (D.D.C. 2008)  ................................................................... 7

*U.S. ex rel. Repko v. Guthrie Clinic*, 557 F. Supp.2d 522 (M.D. Pa. 2008)  .......................... 19,20

*U.S. ex rel. Resnick v. Weill Med. Coll.*,
2010 U.S. Dist. LEXIS 11019 (S.D.N.Y. 2010) ................................................... 20

*U.S. ex rel. Schumann v. Astrazeneca PLC*,
    2010 U.S. Dist. LEXIS 109519 (E.D. Penn., Oct.13, 2010) .................................... 20

*U.S. ex rel. Springfield Terminal Ry. v. Quinn*,
    14 F.3d 645 (D.C. Cir. 1994) .............................................................. 6

*U.S. ex rel. Underwood v. Genentech, Inc.*,
    2010 U.S. Dist. LEXIS 53732 (E.D. Pa. 2010) .................................... 20

*U.S. ex rel. West v. Ortho-McNeil Pharm., Inc.*,
    538 F. Supp. 2d 367 (D. Mass. 2008) .................................................... 6

*U.S. ex rel. Westmoreland v. Amgen, Inc.*,
    812 F. Supp. 2d 39 (D. Mass. 2011) ...................................................... 10

*U.S. ex rel. Wilkins v. United Health Group*, 659 F.3d 295 (3d Cir. 2011) ................................ 20

*United States ex rel. Wood v. Applied Research Assoc., Inc.*,
    328 Fed. Appx. 744 (2d Cir. 2009), *cert. denied*, - U.S. -,
    130 S. Ct. 1285 (2010) ...................................................................... 20

*Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*,
    648 F.3d 452 (6th Cir. 2011) ................................................................ 7

*Williams v. WMX Techs., Inc.*, 112 F.3d 175 (5th Cir. 1997) .................................... 20

## **Statutes**                                                                                      *Page(s)*

31 U.S.C. § 3730 ...................................................................................... 4

31 U.S.C. § 3731 ...................................................................................... 4

42 U.S.C. § 1320 ...................................................................................... 7,8

42 U.S.C. §1396 ...................................................................................... 10

124 Stat. 119.............................................................................................. 7

## **Other Authorities**                                                                                     *Page(s)*

56 Fed. Reg. 35952 (July 29, 1991) ...................................................... 10

65 Fed. Reg. 14289 (March, 2000) ........................................................ 13

73 Fed. Reg. 56832 (Sept. 30, 2008) ....................................................13-14

Fed. R. Civ. P. 9(b) ................................................................................................... 18,20

Fed. R. Civ. P. 12(b)(6) ................................................................................................. 4

Letter, Kevin G. McAnaney, Chief, OIG Industry Guidance Branch,
       September 22, 1999……………………………………………………………13

O.A.C. § 5101:3-1-29 .................................................................................................. 24

OIG Advisory Opinion 10-26 (December 28, 2010) .................................................. 14

OIG Advisory Opinion 99-2 (February 26, 1999) ...................................................... 12


Title 22, Div. 3, Sub. 1, Chap. 3; 22 CCR 51501(A) (2012) .................................24,25

## STATEMENT OF ISSUES TO BE DECIDED

The central issue is whether the Complaint states a claim upon which relief may be granted by alleging with sufficient specificity that Omnicare engages in "swapping" schemes with its nursing-home customers, thus violating the Medicare Anti-Kickback Statute and the False Claims Act.

Also at issue is whether Omnicare's harm to the Medicaid program resulted from its failure to provide Medicaid its best price, in addition to the harm to Medicaid that resulted from Omnicare's illegal kickback scheme.

Defendant also challenges the Court's jurisdiction on public-disclosure grounds.  We show that argument to be frivolous.

## SUMMARY OF ARGUMENT

The Complaint properly sets forth causes of action as to all federal reimbursement claims tainted by Omnicare's kickback scheme.   Omnicare knowingly offered discount prices to nursing homes (skilled nursing facilities, referred to as "SNFs") for residents covered by Medicare Part A insurance to induce referrals of the balance of the SNFs' business.  Relator pleads more than enough information to provide Omnicare notice regarding these schemes—including arrangements with 22 SNFs, prices and timeframes, and interactions with senior-level Omnicare executives.  The circumstances surrounding this fraud—illegal arrangements with SNFs related to drug costs covered by Medicare Part A—were not publicly disclosed.  Based on the kickback violations alone, the Complaint states a cognizable claim against Omnicare. Omnicare's billing of Medicaid at prices that significantly exceeded prices it billed SNFs additionally violates Ohio's admonition against provider fraud as well as California's best price requirement.

## INTRODUCTION

Relator Donald Gale, P.Ph.,is a pharmacist. For 16 years, from 1994 to 2010, Relator worked for Omnicare as a consulting pharmacist, director, director of operations, vice president of operations and general manager of its Wadsworth pharmacy, until he resigned in early 2010. Omnicare is not a neighborhood druggist; it is the nation's largest institutional pharmacy company and provider of pharmaceuticals and related pharmacy services to long-term care facilities.  The Wadsworth, Ohio Omnicare pharmacy alone processes more than 140,000 prescriptions per month; more than half of them are prescriptions for which payment is sought and received from a federally funded health care program. Complaint, Doc. 1, ("Compl.") ¶¶ 1, 4. During his employment with Omnicare, Mr. Gale witnessed firsthand the events and circumstances the Complaint describes.

As a condition of federal healthcare reimbursement, Omnicare must comply with the Anti-Kickback Statute ("AKS") and further certify in its provider agreements with the U.S. each year that it complies with the AKS and other federal healthcare laws and regulations. Compl,. ¶ 52.  Mr. Gale alleges that Omnicare offered pricing discounts to nursing homes for provision of drugs covered by the homes' *per diem,* per-patient Medicare Part A reimbursements as an inducement for patient referrals for which Omnicare could bill public insurance programs. This practice, routinely referred to as "swapping," constitutes the payment of remuneration for purposes of inducing referrals, thus violating the AKS.  Claims to federal programs, including Medicare or Medicaid, resulting from such arrangements violate the False Claims Act.

## FACTS

This case involves a form of public health insurance abuse called "swapping."  Mr. Gale rose through the ranks of Omnicare for 16 years, ending with the position of general manager of its Wadsworth, Ohio institutional pharmacy.  During his career with Omnicare—which ended in March 2010, with his entirely-voluntary resignation—Mr. Gale was directly and intimately involved

in contracts with Omnicare's institutional customers, learning, for example, that large Omnicare clients "paid a *per diem* rate that was below Omnicare's own costs." Compl., ¶ 39.  Unable to find any legal explanation for these swapping arrangements, Mr. Gale worked hard to change the practice—which he was specifically told was followed on a nationwide basis, even though Omnicare knew the arrangements were "illegal as hell" and was "trying to phase them out."  *Id.*, ¶¶ 37, 39.  Mr. Gale's efforts were to no avail.  After realizing that internal change was impossible— despite the fact that Omnicare had entered into a Corporate Integrity Agreement with the United States as a result of other False Claims Act violations (*id.*, ¶ 54)—Mr. Gale brought this case.

The economic incentives for swapping arise from the fact that Medicare Part A—sometimes called "traditional" Medicare, which pays for a 100-day nursing-home stay—pays providers a *per diem* rate, called the "Medicare Fee Schedule."  The nursing home must pay for all services provided to the patient out of that *per diem*.  When the nursing home can save money on, for example, prescription drugs, it has more money left from its *per diem*.

"Swapping" occurs when a supplier of goods or services—as relevant here, prescription drugs—gives the nursing home a discount on items for use by Part A patients (which must be purchased out of the *per diem* Medicare payment), to induce the exclusive right to provide goods or services to all other patients in the facility (*e.g.*, Medicaid and private-insurance patients).  For these patients, the supplier (*e.g.*, the pharmaceutical company) bills the third-party payer directly, and of course does so at full price.  Thus, the swap:  Cut-rate services when the nursing home pays, and premium prices when the government or other insurer pays.

Mr. Gale determined that Omnicare offered substantial discounts—for example, phony "prompt payment" discounts exceeding 17%, and *per diem* pricing which was sometimes less than half what was charged in non-swapping situations. Compl., ¶33B.  His Complaint is replete with

- 3 -

both the specific details of the relationships between Omnicare and its customers[1] and includes confirmation by knowledgeable Omnicare personnel of the offering of below-cost Part A services to induce exclusivity[2] and of Omnicare management's knowledge that those offerings were illegal.[3]

## ARGUMENT[4]

Under Rule 12(b)(6), Fed. R. Civ. P., courts "'consider the factual allegations in [the] complaint to determine if they plausibly suggest an entitlement to relief.'" Ctr. for Bio-Ethical Reform, Inc. v. Napolitano, 648 F.3d 365, 369 (6th Cir. 2011), *citing* Ashcroft v. Iqbal, 556 U.S. 662 (2009). However, courts construe the complaint in the light most favorable to the plaintiff, accepting all factual allegations as true. U.S. ex rel. Bledsoe v. Cmty. Health Sys., 501 F.3d 493 (6th Cir. 2007), *citing* Bell Atl. Corp. v. Twombly, 550 U.S. 554 (2007). "Plausible" means "plead[ing] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 884, *citing* Twombly, 550 U.S. at 556.

## I.     THE COURT HAS JURISDICTION

In the closing pages of its brief, Omnicare advances a through-the-looking-glass challenge to the Court's subject-matter jurisdiction, asserting that a court case involving how a subsidiary charges Medicaid for therapeutic oxygen services constitutes a public disclosure of Mr. Gale's swapping allegations.

The False Claims Act's "public disclosure bar" precludes jurisdiction.  31 U.S.C. § 3730(e)(4).  The statute puts jurisdiction in question only if there is a "public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional,

---

[1] *E.g.*, ¶ 50, Omnicare pricing to "SNF No. 24" at or below cost.
[2] *E.g.*, ¶ 39, pricing manager confirms nationwide practice; and ¶ 41, Regional Vice President confirms losses due to Part A discounting.
[3] *E.g.* ¶¶ 37 and 38, alleging that Omnicare management referred to "lowball," "illegal as hell" prices.
[4] Omnicare asserts that the Court should find no right to recover for claims prior to January 2004, pursuant to the FCA. statute of limitations, 31 U.S.C. § 3731(b).  In fact, however, the limitations period is 10 years, pursuant to 31 U.S.C. § 3731(b)(2).  Relator does not intend to seek recovery for claims submitted before January 2000.

- 4 -

administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media[.]"

Omnicare perceives a public disclosure of Relator's Medicare swapping allegations in Omnicare Respiratory Services v. ODJFS, 2010 Ohio 625, 2010 Ohio App. LEXIS 516 (App. Franklin Cty., February 23, 2010).  Undeterred by the fact that this opinion actually followed the Complaint in this case by a month, Omnicare apparently asserts that the *lower court's* opinion, which is not before the Court, was the public disclosure.

The Omnicare Respiratory Services case does not, in the first instance, involve Omnicare, Inc.—the defendant in this case.  Omnicare Respiratory Services, LLC, is a Delaware corporation whose Ohio registration is now defunct.  But this point aside, Judge Tyack's opinion does not mention contracts between Omnicare and nursing homes ("SNFs"); does not mention swapping; does not mention providing services to Part A patients below cost in order to obtain the right to provide services to other patients (and does not, for that matter, mention pharmacy services at all).

The court did note that "[a]s a matter of law . . . Omnicare [Respiratory Services] had been on notice since [a] 2002 audit that the practice of billing Medicaid patients more that non-Medicaid patients for oxygen services was, at the very least, questionable."  2010 Ohio App. LEXIS 516 at *8-9.  However, the opinion relates to a company which is not involved in this case, a commodity not at issue here, monthly, rather than *per diem*, contracts with nursing homes, and a set of regulations which specifically govern oxygen services.  *Id*. at *13-*14.

The public disclosure provision requires an identity of "allegations or transactions," and here, there is neither:  Mr. Gale's "*allegations*" are that, in connection with the provision of pharmaceutical drugs and supplies by Omnicare, Inc., Omnicare violated the anti-kickback statute by undercharging SNFs for *per diem* services for Medicare patients.  And the "*transactions*" he alleges are transactions between Omnicare and the nursing homes, and resulting claims by

- 5 -

Omnicare to the public insurance programs.  There is simply no public disclosure of Mr. Gale's allegations in the oxygen case.

Even were the discussion of differential pricing contained in the Franklin County oxygen case sufficient to disclose a differential-pricing scheme which transcended the oxygen industry and encompassed the pharmaceutical industry (a proposition sufficiently fanciful that Omnicare surely will not endorse it), the public-disclosure bar is not triggered because the oxygen case is by no means  "adequate to set the government squarely on the trail of fraud." U.S. ex rel. West v. Ortho-McNeil Pharm., Inc., 538 F. Supp. 2d 367, 387 (D. Mass. 2008), *quoting* U.S. ex rel. Fine v. Sandia Corp., 70 F.3d 568, 571-72 (10th Cir. 1995).  Relator respectfully submits that there is a complete absence of legal and factual basis for defendant's public disclosure claim, and so moves on.  Should the Court find it wise to pursue the inquiry, a universally-accepted starting point is the D.C. Circuit's opinion in United States ex rel. Springfield Terminal Ry. v. Quinn, 14 F.3d 645(D.C. Cir. 1994), where the panel said, "[f]raud requires recognition of two elements: a misrepresented state of facts and a true state of facts. The presence of one or the other in the public domain, but not both, cannot be expected to set government investigators on the trail of fraud."  The Sixth Circuit has routinely relied on Springfield Terminal,  *E.g.* U.S. ex rel. Dingle v. Bioport Corp., 388 F.3d 209, 215 (6th Cir. 2004) (stressing requirement that public disclosure put the government on the "trail of fraud"), *cert. denied*, 544 U.S. 949 (2004).

## II.    MR. GALE'S COMPLAINT STATES A CLAIM FOR RELIEF UNDER THE FCA

Omnicare seeks to fight a battle widely understood to have been lost a decade ago, bemoaning the fact that "some courts" have "bootstrap[ped]"[5] kickback allegations into a cause of action

---

[5] The cases Omnicare cites for its "bootstrap" claim actually document the long history of cases holding that AKS violations trigger FCA liability.  U.S. ex rel. Hutcheson v. Blackstone Medical, Inc., 647 F.3d 377 (1st Cir. 2011) and U.S. v. Rogan, 459 F. Supp. 2d 692, 714, 717 (N.D. Ill. 2006), aff'd 517 F.3d 449 (7th Cir. 2008)  establish beyond credible challenge that claims submitted to Medicare and Medicaid as a result of kickback-tainted relationships violate the False Claims Act.

under the FCA. Defendant's Memorandum (Doc. 28) at 8. This is absurd. Not only have a "[l]egion other cases" held that violations of the AKS can be pursued under the FCA (U.S. ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc., 565 F. Supp. 2d 153, 159 (D.D.C. 2008)), but Congress has amended the AKS  to remove any vestigial argument that claims resulting from kickbacks violate the FCA.  Pub. L. No. 111-148, § 6402(f)(1), 124 Stat. 119, 759 (amending 42 U.S.C. § 1320a-7b). Violations of the AKS obviously are actionable under the FCA.[6]

Omnicare cites an antitrust case, Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc., 648 F.3d 452, 457 (6th Cir. 2011), for the elements of this False Claims Act case. Doc. 28 at 8.  Whatever Omnicare's reason for relying on an antitrust conspiracy case, it has little application here.  The essence of a kickback violation is an offer of remuneration to induce referral of federal healthcare business.  42 U.S.C.S. § 1320a-7b(b)(2)(A).   To properly plead a violation of the FCA as a result of kickbacks, a relator must allege Defendant 1)offered or paid any remuneration 2) to induce referrals of federal healthcare business.

This, Mr. Gale has done.  Remuneration has been interpreted broadly by courts of this Circuit to mean "anything of value in any form whatsoever." U.S. ex rel. Fry v. The Health Alliance, 2008 U.S. Dist. LEXIS 102411, *20-21 (S.D. Ohio, December 18, 2008) (internal citation omitted).  "Induce" has also been interpreted broadly.  Courts have found the AKS is implicated if even "any purpose" of the conduct is "to induce" the referral of federal healthcare business. U.S. v. Rogan, 459 F. Supp. 2d 692, 722 (N.D. Ill. 2006), aff'd 517 F.3d 449 (7th Cir. 2008). As further explained in Rogan and in Section 2.3, infra, plaintiffs have the burden to prove at trial, by a preponderance of evidence that these actions were undertaken knowingly and willfully. Of course, for the purpose of 9(b),  these may be averred generally. Thus, if even one alleged, plausible purpose of Omnicare in offering below-cost, below-Medicaid per diem pricing and illusory "prompt

---

[6] U.S. ex rel. Fry v. The Health Alliance of Greater Cincinnati, 2008 U.S. Dist. LEXIS 102411, *12-13 (S.D. Ohio Dec. 2008); U.S. ex rel. Lisitza v. Johnson & Johnson, 765 F. Supp. 2d 112, 127-28 (D. Mass. 2011).

pay" discounts to SNFs for Medicare Part A patients' drugs was to induce the referral to Omnicare

of other, non-Medicare Part A business – and Mr. Gale has alleged that it was—then he has stated a

claim of illegal kickbacks in violation of the False Claims Act.

### 1.  Relator sufficiently pleads that Omnicare's swapping arrangements result in illegal remuneration to its SNF customers

Omnicare's claim that *per diem* pricing cannot be "remuneration" under the AKS is flatly

wrong.  The AKS prohibits an entity from offering or paying remuneration *of any kind* to induce the

referral of items or services paid in whole or in part by federal healthcare programs. 42 U.S.C. §

1320a-7b(b).  Remuneration includes the transferring of anything of value in any form whatsoever.

Fry, 2008 U.S. Dist. LEXIS 102411 at *20-22; U.S. ex rel. McDonough v. Symphony Diagnostic

Servs., Inc., 2011 U.S. Dist. LEXIS 153583, *16 (S.D. Ohio, February 27, 2012)(internal citation

omitted). Certainly, the discounts and pricing offered by Omnicare are valuable and tangible.

The Complaint clearly states that Omnicare offers something of value to SNFs to induce

referrals. For instance, it states that:

> Omnicare offers and provides per diem pricing *at rates*, adjusted for patient
> population and drug mix, that are *below* the prices it charges other SNFs or other
> customers for Medicare Part A patients, *below* the prices it charges Medicaid for the
> same mix of drugs and supplies, *below* the prices it charges to other customers
> generally, and even, in some instances, *below* its own costs.

Compl., ¶ 24 (emphasis added). It further alleges that "Omnicare has offered and provided 'prompt

payment' discounts …. as much as 17.4%, to [selected] SNFs regardless of whether they promptly

pay." *Id.*, ¶ 25. It describes the allegation that Omnicare offered "reduced Medicare Part A pricing

to selected SNFs," "to induce those SNFs to refer to Omnicare." *Id.*, ¶ 30.  This is more than

sufficient to state an AKS violation under Rule 12(b)(6), Fed. R. Civ. P.  Judge Marbley of the

Southern District of Ohio recently confirmed that swapping states a claim for a violation of the

AKS. In <u>McDonough</u>, the defendant moved to dismiss a Relator's claim for failure to allege

sufficient details of remuneration under an alleged swapping scheme.

> The Amended Complaint alleges that in furtherance of the Medicare fraud scheme,
> Mobilex bills the SNFs for its portable x-ray services at rates below market value,
> and at times even below Mobilex's costs for the services. FAC ¶¶ 67, 71. Mobilex
> does this in exchange for securing exclusive referrals of the SNFs' Medicare Part B
> and Medicaid patient care services. *Id*. ¶¶ 56, 68. Mobilex argues that Plaintiff's
> failure to allege either what the fair market value was for these services, the amount
> actually charged by Mobilex during the same time period, or the difference between
> the two, is fatal to the Complaint's success …. Mobilex, however, fails to provide
> adequate support this characterization of existing precedent.

<u>Id.</u> at *17-18.

Ignoring Relator's allegations that Omnicare prices are *below its cost*, the defendant focuses

entirely on whether its *per diem* pricing is comparable to Medicaid rates.  Regardless:  As recently

explained by Judge Speigel in <u>Fry</u>, there is "no question that Plaintiff has adequately pleaded

Defendants set up a system whereby [defendant] received something of value . . . in exchange for

referrals." 2008 U.S. Dist. LEXIS 102411 at *19-20. And upon facts which closely parallel those at

bar, Judge Marbley recently held that

> [a]t the pleading stage, prior to discovery, the plaintiff cannot be expected to provide
> complete details of the necessary sensitive corporate statistics to support his
> allegations on issues of costs and pricing.  It is sufficient that the Plaintiff's
> Amended Complaint alleges that Mobilex provided its x-ray services to SNFs at
> below-market and below-cost rates, and provides some factual details which, at least
> on their face, support these allegations.

<u>McDonough</u>, 2011 U.S. Dist. LEXIS 153583 at*20-21. Relator's structurally-identical allegations,

that Omnicare provided something of value (*i.e*., discounts for Part A services which cannot be

justified by normal business considerations) with a purpose of inducing referral of patients to whom

it provides Part B services, state a claim for violations of the FCA. Whether the discounts were

illegal remuneration is a question of fact.  A motion to dismiss tests "the plaintiff's cause of action

as stated in the complaint, not a challenge to the plaintiff's factual allegations." <u>Golden v. City of Columbus,</u> 404 F.3d 950, 958-59 (6th Cir. 2005).

A word is also in order regarding the prompt-payment allegations. Compl., ¶¶ 25-27, 33, 49. While Omnicare brushes aside the assertion that it offered commercially-unreasonable discounts of up to 17.4%, and did so without regard to whether payment actually was prompt, these facts are quite important. For example, the Medicare laws require that "customary prompt pay discounts" be deducted in computing average manufacturer pricing to retail pharmacies (42 U.S.C. §1396r-8(k)(1)). And obviously, a prompt payment discount must be commercially reasonable if it is not to be considered an illegal inducement. Indeed, the HHS Final Rule on enforcement of the AKS, published in 1991, recognizes that such payments may be "made for an illegal purpose cloaked under a legitimate label." 56 Fed. Reg. 35952, 35979 (July 29, 1991). Here, Mr. Gale's allegation is simple enough: That the misnomer "prompt payment discount" was applied here to knock nearly one-fifth off the price of Part A sales to SNFs—regardless of whether the payment was even "prompt." This allegation, which is made on Mr. Gale's personal knowledge of the defendant's SNF contracts, squarely supports Mr. Gale's assertion that the 17% discounts were disguised kick-backs.

### 2. Relator sufficiently pleads that "a purpose" of Omnicare's remuneration is to induce referrals.

The thrust of Omnicare's brief, in focusing on whether Medicaid pricing can offer a barometer to gauge "remuneration," distracts from the gravamen of the AKS: the inducement. The key inquiry is whether <u>one</u> of the purposes for which Omnicare offered lowered pricing and other discounts to the nursing homes was for the purpose of inducing patient referrals. <u>U.S. ex rel. Westmoreland v. Amgen, Inc.</u>, 812 F. Supp. 2d 39, 47-48 (D. Mass. 2011) (denying motion for judgment on the pleadings in pharmaceutical qui tam case predicated on kickback violations); <u>Rogan</u>, 459 F. Supp. 2d at 722; <u>U.S. v. Bay State Ambulance & Hosp. Rental Serv., Inc.</u>, 874 F.2d

20, 30 (1st Cir. 1989); U.S. v. Greber, 760 F.2d 68, 72 (3d Cir.), *cert. denied*, 474 U.S. 988 (1985).

Relator sufficiently alleges that the reduced and below-cost pricing and discounts were of value to

Omnicare's trading partners, and that a purpose of the reduced pricing and discounts offered by

Omnicare was to induce payments. For example, Relator alleged that Omnicare:

> solicits contracts from those SNFs, and offers the diem pricing to those SNFs, to
> induce the SNFs to refer to Omnicare the furnishing or arranging for the furnishing
> of drugs to the balance of the SNFs' patients.

Compl., ¶ 24. Relator alleges that the arrangements were made by Omnicare "to induce" SNFs to

refer patients. *Id.*, ¶¶ 24, 25 26, 30. Relator alleges a specific conversation in which Omnicare

management acknowledged "low balling" Medicare Part A prices in order to induce referrals of all

of a SNF's business, while omitting reference to that illegal purpose from its contracts:

> In or about November 2009, the Relator visited SNF No. 23, a facility within this
> District.  A representative of SNF No. 23 told the Relator that Omnicare's
> competitors were low-balling, that is, pricing their Medicare Part A drugs below
> their Medicaid prices in order to gain the referral of all of a SNF's drug business.
> The SNF No. 23 representative said to the Relator words to the effect of, "look me in
> the eye and tell me you don't go below Medicaid."  After the visit, the Relator called
> the Omnicare Regional V.P.  The Regional V.P. told the Relator words to the effect,
> "you could have said there are no contracts that say that."  The Relator responded
> with words to the effect of, "come on, but we do it."  The Regional V.P. replied, in
> substance, "but the contracts don't *say* we do."

*Id.*,¶ 38.  Relator alleges Omnicare management's acknowledgement, at a regional meeting, that it

would be "engaging in fraud" to offer low Medicare Part A per diem pricing to induce the rest of

the SNF's beds to use Omnicare, but that it continued to do so, in specifically alleged instances,

nonetheless.  *Id., ¶*41.  The Complaint goes beyond what is necessary and alleges that Omnicare's

efforts produced results in 22 specific instances, where "in return" for Omnicare's pricing

agreement with SNFs, "Omnicare was able to service substantially all of [the SNF's] patients,

including those for whom claims were made to non-Part A Medicare, Medicaid and/or other Federal

health care programs." *Id., ¶¶* 33A, C-V, *accord ¶* B.

- 11 -

Judge Marbley's recent decision in <u>McDonough</u> follows a principle that has been repeatedly recognized by the agency that implements the AKS: discounts offered on Part A business to induce referrals of other federally-funded business are squarely within the reach of the AKS.  The conclusion has been reached in countless situations analogous to Omnicare's by the Office of Inspector General (OIG) of the Department of Health and Human Services (HHS).  For example, in Advisory Opinion 99-2 (February 26, 1999), the OIG determined that a pricing arrangement discounted from the Medicare Fee Schedule (MFS) implicated the AKS. [7]  Evaluating whether a nexus existed between the discounts and the referrals of federal healthcare business, the OIG identified a non-exhaustive list of factors which make discounts "suspect" for kickbacks, including the following:

o  discounted prices below provider's costs;
o  discounts lower than that offered similar suppliers without Part B business;
o  discounts coupled with exclusive provider agreements; and
o  discounts on Medicare PPS coupled with implicit or explicit referral agreements.

Adv. Op. 99-2 at pp.4-5.  Here, Relator observed and alleges that Omnicare offers discounts below its costs. Compl., ¶¶ 24, 37, 39. He observed and alleges that Omnicare has charged others "at prices above those Medicare Part A prices." Compl., ¶ 33A.   He observed that the discounts on Medicare PPS are coupled with implicit referral agreements. (Compl., ¶¶ 33A-C; "As part of Omnicare's contractual agreements with [identified SNFs]," Omnicare provided particular rates and "in return, Omnicare was able to service substantially all of [the SNF's] patients."). He observed and alleges that Omnicare would agree with its SNF customers to "true up" their illegal prices to legal ones, at some point down the road, but never intended to do so, and in fact did not.  Compl., ¶47.  Relator further supports his allegations with a specific example at paragraph 48 in his Complaint. When Omnicare approached an SNF to negotiate increased Part A pricing, the SNF

---

[7] In that scenario, an ambulance company charged SNFs a fixed per transport rate that is fifty percent (50%) off the Medicare Fee Schedule and then charged Medicare its full rate for Part B services.

threatened to "find another pharmacy to service its entire facility if Omnicare were to raise its Medicare Part A per diem rate. As a result Omnicare maintained its reduced Part A pricing for [the SNF]."

In a follow-on letter dated September 22, 1999, the OIG explained that Advisory Opinion 99-2 would apply to arrangements between SNFs and any ancillary services provider. The letter notes that such arrangements "fell squarely within the anti-kickback statute" when the "provider was giving something of value to the SNF (a discount on PPS-covered business) that was tied to referrals of the SNF's Part B [business]."[8] The OIG made clear that the AKS is an intent-based statute and that a discount may not be passed on to a SNF "if the intent of providing this cost-saving discount is to induce the referral of Part B services." Id.  This is precisely the intent Relator alleges, and Rule 9(b) provides that this allegation be made generally.

In Compliance Program Guidelines for Nursing Facilities, issued in 2000, the OIG stated that a kickback violation would likely occur where "suppliers…offer a SNF an excessively low price for items or services reimbursed under PPS in return for the ability to service and bill nursing home residents with Part B coverage." 65 Fed. Reg. 14289, 14298 n. 75 (March 16, 2000). That the Anti-Kickback Statute prohibits the conduct at issue in this Complaint was reinforced by 2008 OIG Program Guidance regarding "swapping" in the nursing-home context:

> Nursing facilities should not engage in ''swapping'' arrangements by accepting a low price from a supplier or provider on an item or service covered by the nursing facility's Part A per diem payment in exchange for the nursing facility referring to the supplier or provider other Federal health care program business, such as Part B business excluded from consolidated billing, that the supplier or provider can bill directly to a Federal health care program. Such ''swapping'' arrangements implicate the anti-kickback statute and are not protected by the discount safe harbor. …
>
> In sum, if any direct or indirect link exists between a price offered by a supplier or provider to a nursing facility for items or services that the nursing facility pays for

---

[8] Letter, Kevin G. McAnaney, Chief, Industry Guidance Branch, September 22, 1999 (online at http://oig.hhs.gov.fraud/docs/safeharborregulations/rs.htm).

out-of-pocket and referrals of Federal business for which the supplier or provider can bill a Federal health care program, the anti-kickback statute is implicated.

OIG Supplemental Compliance Program Guidance for Nursing Facilities, 73 Fed. Reg. 56832.

56844 (Sept. 30, 2008).

In Advisory Opinion 10-26 (December 28, 2010), HHS OIG determined that below cost services offered to SNF patients implicated the AKS.[9] The scheme involved per diem rates for Medicaid patients, regardless of the number of actual transports used, and the waiver of co-payments for patients who were dual eligible for Medicare and Medicaid. In the alternative, the ambulance company suggested a flat rate for Part A patients below the MFS, and below cost. HHS-OIG concluded that this program could generate prohibited remuneration under the AKS, as this plan, like Omnicare's scheme here, contained a "link or connection, whether explicit or implicit, between the price offered for business paid out of the purchaser's pocket and referrals of federal program business." Adv. Op. 10-26 at p.4. In the advisory opinion, the ambulance company at issue offered *per diem* rates regardless of the number of actual transports performed. Here, Relator alleges Omnicare offered *per diem* rates to its SNF clients for referrals. He alleges a link between the price offered for business paid out of the SNF's pocket and referrals of federal program business.

Relator also alleges with particularity that Omnicare's pricing induced referrals.  Going beyond what is necessary, however, his facts also support the allegation that Omnicare offered below fair market value pricing to select SNFs. While this is not an element of the AKS, it may be evidence of inducement, and courts "may infer that any excess paid over fair value is intended to induce referrals. . ."  U.S. ex rel. Obert-Hong  v. Advocate Health Care, et al, 211 F. Supp. 2d 1045,

---

[9] The facts considered by the Inspector General involved an ambulance company which proposed to offer below cost rates for transport of Part A patients, in implicit exchange for the right to transfer Part B patients, and other Government beneficiaries.

1049, n.3 (N.D. Ill 2002).[10]  Thus, Omnicare's provision of a below-fair-market-value benefit lends

to the presumption that the remuneration was intended to induce referrals.  The Complaint asserts

that Omnicare provided below fair market rates to induce referrals.[11] Compl., ¶ 24.  In addition to

alleging that Omnicare's pricing rates were below-cost and below the prices charged to other

customers, Relator alleges, *e.g.*, that:

> On or about November 30, 2009, the Relator had a telephone conversation with an
> Omnicare financial analyst ("Pricing Manager").  Pricing Manager told the Relator
> that approximately ten Omnicare client SNFs in Ohio paid a per diem rate that was
> below Omnicare's own costs for the drugs and supplies. … The Relator asked
> Pricing Manager whether that was a nationwide issue.  Pricing Manager told the
> Relator that Omnicare pharmacies all over the country were engaging in that
> practice, either currently or in the past, and that the problem was particularly bad in
> California.

*Id.* ¶ 39 (emphasis added). Defendant makes much of whether the Medicaid average daily price can

properly be a gauge for whether the Medicare Part A price was a discount. Besides being an

inappropriate factual inquiry at this stage of the litigation, Relator also alleges the rates were often

below Omnicare's own costs. *E.g.*, ¶¶  24, 37, 39.  Prices below the supplier's cost are particularly

suspect. Advisory Opinion 99-2 issued February 26, 1999.

The Complaint repeatedly asserts that the below-cost benefit offered by Omnicare was to

induce referrals—referrals in the form of exclusive access to the highly-lucrative market for all of

the SNFs' non-Part A business.  This is a simple concept:  In order exclusively to reap the profits

from the fee-for-service *non*-Part A (and privately-insured) patients, Omnicare was willing to—and

did—subsidize the nursing homes' Medicare Part A business.  Because of the *per diem* nature of the

---

[10] *Citing* U.S. v. Lipkis, 770 F.2d 1447 (9th Cir. 1985*);accord* Am. Lith. Soc. v. Thompson, 215 F. Supp.2d 23, 27
(D.D.C. 2002)("Payment exceeding fair market value is in effect deemed payment for referrals"); Rogan, 459 F. Supp.
2d at 716 (finder of fact may infer that payments were intended to be kickbacks based on testimony that the recipient of
the payments "was grossly overpaid . . . for any legitimate professional services he may have rendered")(internal
quotation omitted).
[11] The Complaint plainly alleges that Omnicare's pricing is below fair market value or is not commercially reasonable,
although it does not parrot those phrases.  However, should the Court deem it necessary to include specific phrasing,
Relator respectfully requests leave to amend.

Part A billings, that subsidy went straight to the nursing homes' financial bottom line.  Mr. Gale

also alleges that Omnicare intentionally maintained its low rates to induce continued referrals:

> In 2009, Omnicare approached SNF No. 2 in an attempt to negotiate increased Part
> A pricing.  SNF No. 2 told Omnicare that it would find another pharmacy to service
> its entire facility if Omnicare were to raise its Medicare Part A per diem rate.  As a
> result, Omnicare maintained its reduced Part A pricing for SNF No. 2.

Compl., ¶ 48. This plainly and specifically alleges an intentional violation of the AKS.

At bottom, Relator alleges that Omnicare offered remuneration (discounted *per diem*

pricing) to induce referrals.  If Omnicare's argument regarding Medicaid pricing is, in actuality, a

challenge to whether its per diem pricing is below fair market value, its challenge to the sufficiency

of evidence is misplaced.  The question is whether Relator's allegations set out a claim which is

"plausible on its face" or allege sufficient facts to "raise a right to relief above the speculative

level." Twombly, 550 U.S. at 555. The allegations of the Complaint squarely support the inference

that discounts were something of value offered to SNFs to induce referrals in violation of the AKS,

resulting in the submission of false claims to the United States.[12]

### 3. Relator adequately pleads allegations that Omnicare acted with the requisite intent.

As Omnicare acknowledges, intent may be generally averred.  Here, Mr. Gale has personal

knowledge that Omnicare knew what it was doing. Compl., ¶¶ 27, 30. Relator also pleads additional

facts that strongly support the inference that Defendant acted knowingly and willfully.  For

instance, the Complaint alleges that Omnicare management stood up at a regional meeting, when

challenged about the very lowball pricing described in the Complaint, and "said that Omnicare

would be engaging in fraud if it were to offer low prices on the Medicare Part A beds just to service

---

[12] Moreover, swapping arrangements are specifically excepted from safe harbor protection. In any case, Omnicare would bear the burden that it meets a safe harbor exception and proof of the opposite is not an element of the AKS. Relator "need not prove, as an element of [his] case, that defendant's conduct does not fit within a safe harbor or exception." Rogan at 716, *citing* U.S. v. Shaw, 106 F. Supp. 2d 103, 122 (D. Mass. 2000).

all of the facility's non-Medicare Part A patients," yet Omnicare did nothing to change the pricing.

*Id*. ¶41.  The Complaint alleges that Omnicare management and pricing personnel confirmed to

Relator that the conduct he described "has occurred nationwide, for many years, as a matter of

Omnicare policy." *Id.* ¶ 33. The Complaint also alleges that

> [o]n multiple occasions in 2009, he asked Omnicare management and pricing
> personnel about those pricing decisions. Omnicare management and pricing
> personnel confirmed to the Relator that Omnicare was engaging in those practices
> nationwide, and with words to the effect that Omnicare had contracts that were
> "illegal as hell".

*Id.* ¶ 37. While Relator includes that the management intended to phase the contracts out, he alleges

also that there were continued exceptions to any such plan.  He alleges that when he told his

Regional Vice President that a SNF had referred to Omnicare's per diem inducements, the Vice

President attempted to justify those inducements by saying  "the contracts don't say we do" offer

those inducements.  *Id.* ¶38. He further identifies a Pricing Manager who was aware that Omnicare

pharmacies all over the country were charging per diem rates below Omnicare's own costs. *Id.* ¶ 39.

He alleges that Omnicare would purport to "true up" its prices to legal levels, but did not intend to

do so, and did not do so.  *Id.* ¶47. He alleges Omnicare's knowledge of the laws, as evident in the

provider agreements, *id.* ¶ 52, and in its multiple False Claims Act settlements and corporate

integrity agreements to which it is a party with the federal government. *Id.*, ¶54. The AKS prohibits

the payment of any remuneration, *directly or indirectly*, that has *one or any purpose* of inducing the

referral, purchase, or recommendation of an item or service paid *in whole or part* by the U.S. This is

a pre-condition for payment to be received by any provider. Indeed, as referenced in Paragraph 52

of the Complaint, in order to be eligible for any Medicare payment, every provider must certify in

its provider application that:

> I understand that payment of a claim by Medicare is conditioned upon the *claim and
> the underlying transaction* complying with such laws, regulations, and program

- 17 -

instructions (including, but not limited to, the Federal anti-kickback statute and the
Stark law), and on the [provider's] compliance with all applicable conditions of
participation in Medicare.

Form CMS-855A; Form CMS-855I (effective 2001).  Relator has thus sufficiently pleaded that

Omnicare acted with the requisite intent.

### III.    THE COMPLAINT SATISFIES RULE 9(b)'s PARTICULARITY REQUIREMENT

The linchpin of the defendant's motion is its argument that unless the relator can plead the

specific facts of a claim for reimbursement submitted by the defendant to the United States, then the

complaint fails to state a claim upon which relief may be granted.  Doc. 28 at 7.  In fact, however,

"Congress wrote expansively, meaning 'to reach all types of fraud, without qualification, that might

result in financial loss to the government.'" Cook County. v. U.S. ex rel. Chandler, 538 U.S. 119,

129 (2003), *quoting* U.S. v. Neifert-White Co., 390 U.S. 228, 232 (1968).

### A.    Rule 9(b) requires fair notice to the Defendant of Relator's claims—not the pleading of evidence.

"[T]he purpose undergirding the particularity requirement of Rule 9(b) is to provide a

defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a

responsive pleading." Michaels Building Co. v. Ameritrust Co., N.A., 848 F.2d 674, 679 (6th Cir.

1988). The Fifth Circuit recently held, in a qui tam case, that Rule 9(b) does not "reflect a

subscription to fact pleading" and requires only  "simple, concise, and direct" allegations of the

"circumstances constituting fraud."  U.S. ex rel. Grubbs v. Kanneganti,  565 F.3d 180, 186 (5th Cir.

2009).

The premise of the motion to dismiss is that a uniquely-vicious Rule 9(b) applies to False

Claims Act cases–an inflexible Rule that requires all relators to plead detailed evidence of a specific

false claim actually submitted the United States.  But this is not the law.  In Fry, 2008 U.S. Dist.

LEXIS 102411 at *36-37, Judge Spiegel sustained a complaint which was predicated on False

Claims Act liability kickbacks between a hospital and surgeons. The Court relied on <u>U.S. ex rel.</u>

<u>Repko v. Guthrie Clinic,</u> 557 F. Supp.2d 522, 527 (M.D. Pa. 2008), for the proposition that

> attachment [to the complaint] of some or all of the allegedly fraudulent claims would
> serve no further purpose consistent with Rule 9(b) because defendants are on notice
> that the basis of the alleged fraud in each claim is the relationship between the
> defendants, not anything unique to a particular claim, that has caused these claims to
> be allegedly fraudulent.

The court in <u>U.S. ex rel. Cox v. Smith & Nephew, Inc.</u>, 749 F. Supp. 2d 773, 785 (W.D. Tenn.

2010), rejected the defendant's contention that dismissal was required where no individual false

claims were pled. The court found "significant detail, including the contracts under which the

allegedly illicit sales occurred and the items that are allegedly labeled falsely." In <u>U.S. ex rel. Lane</u>

<u>v. Murfreesboro Derm. Clin.</u>, PLC, 2010 U.S. Dist. LEXIS 46847 (M.D. Tenn. 2010), the court

declined the defendant's invitation to insist upon pleading specific claims, holding that the issue

was controlled by <u>Michaels Building's</u> venerable holding that the purpose of Rule 9(b) is "to

provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may

prepare a responsive pleading". <u>Id.</u> at *8. And this Court applied <u>Michaels Building</u> in the FCA

context in <u>U.S. v. Guy</u>, 2006 U.S. Dist. LEXIS 46053 at *16-19 (N.D. Ohio, July 7, 2006).

Most recently, in <u>McDonough</u>, the defendant, which supplies mobile x-ray services to

nursing homes, argued that the allegations of swapping failed because the relator did not alleged

any specific false claim. The court disagreed, because

> the Amended Complaint contains well-pleaded particularities drawn from Plaintiffs'
> personal experience that, collectively, support a strong inference that Mobilex
> submitted claims pursuant to the swapping scheme that Plaintiff alleges, and thus,
> would have been fraudulent. ...While no specific claim is identified, specific
> representative examples of the swapping scheme at issue are identified, and in this
> case that is enough to satisfy the particularity requirements of Rule 9(b).

<u>McDonough</u>, 2011 U.S. Dist. LEXIS at 27-28(S.D. Ohio, February 27, 2012) .

- 19 -

There is no inflexible rule in this Circuit or anywhere else requiring that a specific claim be attached to every False Claims Act case, no matter the context.  This is hardly surprising, not only because "'Rule 9(b)'s ultimate meaning is context-specific,' and thus there is no single construction of Rule 9(b) that applies in all contexts," (Grubbs, 565 F.3d at 188, quoting Williams v. WMX Techs., Inc., 112 F.3d 175, 178 (5th Cir. 1997)) but also because it is not necessary to prove with certainty the existence of such a claim at all. Rather, as False Claims Act claims must be proven by a preponderance of the evidence (31 U.S.C. § 3731(d)), the burden on a relator is to prove that it is more likely than not that such claims occurred.

Here, the identity of a specific patient does not further the purpose of putting the Defendant on notice, as this is a case about the financial relationships between the Defendant and its institutional clients. Judge Spiegel's observation in Health Alliance (drawn from Repko) is precisely on point:  "[A]ttachment of some or all of the allegedly fraudulent claims would serve no further purpose consistent with Rule 9(b) because defendants are on notice that the basis of the alleged fraud in each claim is the relationship between the defendants."  2008 U.S. LEXIS 102411 at *37.

The notion that Rule 9(b) requires Mr. Gale to plead evidence of a particular false claim is widely discredited.  Under the clear majority rule, now applied in at least the First, Second, Third, Fourth, Fifth, Seventh, Ninth, Tenth, and D.C. Circuits, and by district courts in the Sixth Circuit, "claims under the FCA need only show the specifics of a fraudulent scheme and provide an adequate basis for a reasonable inference that false claims were submitted as part of that scheme."[13]

---

[13] U.S. ex rel. Schumann v. Astrazeneca PLC, 2010 U.S. Dist. LEXIS 109519. *29  (E.D. Penn., Oct.13, 2010), *quoting* U.S. ex rel. Lemmon v. Envirocare, Inc., 614 F.3d 1163 (10th Cir. 2010).  *Accord* U.S. ex rel. Wilkins v. United Health Group, 659 F.3d 295 (3d Cir. 2011); Ebeid v. Lungwitz, 616 F.3d 993 (9th Cir. 2010), *cert. denied,* 131 S.Ct. 801 (2010); Grubbs,  565 F.3d at 188-90;  U.S. ex rel. Lusby v. Rolls-Royce Corp., 570 F.3d 849 (7th Cir. 2009); United States ex rel. Wood v. Applied Research Assoc., Inc., 328 Fed. Appx. 744 (2d Cir. 2009), *cert. denied,* — U.S. —, 130 S. Ct. 1285 (2010); U.S. ex rel. Duxbury v.Ortho Biotech Prods., Inc., 579 F.3d 13, 29 (1st Cir. 2009), *cert. denied,* 130 S. Ct. 3454 (2010); U.S. ex rel. Resnick v. Weill Med. Coll., 2010 U.S. Dist. LEXIS 11019 (S.D.N.Y. 2010); United States ex rel. Folliard v. CDW Tech. Svcs, 722 F. Supp.2d 20 (D.D.C. 2010); U.S. ex rel. Underwood v. Genentech, Inc., 2010 U.S. Dist. LEXIS 53732 (E.D. Pa. 2010).

**The Complaint strongly supports the inference that Omnicare's kickback schemes caused SNFs to submit false claims.**

Mr. Gale worked for Omnicare for 16 years, most recently as General Manager of its Wadsworth, Ohio pharmacy.  That facility processes 140,000 prescriptions monthly, over half of which are funded by federal health care programs.  He was employed by Omnicare from 1994 to 2008, as a consulting pharmacist, director of operations, vice president of operations, and executive director at Wadsworth, where he learned first-hand of the conduct described in the Complaint. Compl., ¶ 1. He was "required, in the course of his duties, to review and approve pricing worksheets and quotes to be offered under new Omnicare contracts with SNFs." *Id.,* ¶ 40. He had conversations with Omnicare pricing managers and executive(s) who acknowledged the details of a nationwide scheme. Relator was thus positioned to have first-hand knowledge of the pricing irregularities, as well as knowledge that Omnicare dealt with SNFs that submitted claims to Medicare.  Mr. Gale additionally alleges the manner in which Omnicare causes claims to be submitted for payment by the federal government.  *Id.*, ¶¶ 14-18.  Courts in this Circuit have easily found such knowledge sufficient to support the inference that false claims were submitted.  In <u>McDonough</u>, the Court found allegations of specific conversations with the CEO in which the CEO acknowledged the defendant performed Part A work, admitting to charging SNFs non-compliant rates, and providing a list of a sample of the SNFs for which the defendant was illegally swapping rates, sufficient. 2011 U.S. Dist. LEXIS at *28.

Relator alleges SNFs are paid *per diem* fee for each patient covered by Medicare Part A, which includes a limited number of in-patient nursing-home days. The daily payment covers all the services provided that day, including drugs.  Any profits are retained by the SNF, and any losses must be absorbed by the SNF. As alleged by Relator, "to the extent a SNF can reduce its costs for pharmaceutical drugs and supplies associated with their Medicare Part A patients, the SNF can

maximize profits from its Medicare Part A reimbursements." Compl., ¶ 17.  In cases where drugs

are reimbursed under other parts of Medicare or other federally-funded programs, Omnicare may

submit these claims to the program. *Id.,* ¶ 18. Relator thus clearly explains the "scheme" to defraud

Medicare: Omnicare entered into contracts with selected SNFs to provide drugs at discounted prices

that allowed SNFs to maximize their profits from Part A reimbursements, and in return induced the

SNFs to refer to Omnicare the balance of the SNFs' patients. *Id.,* ¶ 24.

Relator's allegations regarding Omnicare's conduct are supported factually with numerous

particulars.  Omnicare's contracts include *per diem* pricing, pursuant to which SNFs agree to pay

Omnicare a set amount for each Part A resident for pharmaceuticals. Examples of *per diem*

contracts are listed in Paragraph 33 of the Complaint.  Moreover, for each of the SNFs identified in

¶ 33, Relator identifies the rate Omnicare charged and a corresponding time period.  Relator also

identifies SNFs for which the rate was supposed to be reviewed and adjusted, but was not.  While it

is true that the SNFs are identified by numbers, each number correlates to a name, which can easily

be provided to both the Court and defendant.

Relator also identifies a SNF which received the benefit of a phony "quick pay discount," as

well as the amount of the discount.  Compl.,  ¶ 33B. These particulars meet the particularity

requirements of 9(b).

In evaluating whether the Relator's allegations were sufficient, Judge Marbley in

McDonough found that the relator "easily meets his burden" of pleading the particularity

requirements of 9(b) by providing "representative examples of which SNFs were involved, the

nature of the swapping scheme, including even the degree of the discounted [*sic*] Mobilex provided;

and the range of years, '2004 to the present' during which Mobilex and large SNFs have engaged in

the swapping scheme." Id. at 31 (emphasis added).  In the instant case, Relator provides just such

information: identifying representative examples of which SNFs were involved, describing the

nature of the contractual arrangement, the specific rates provided, and the range of years it was provided.

### B.  Leave to amend

Should the Court conclude that, despite the factual detail supplied by Mr. Gale and the strength of the correlative inference that Omnicare's conduct led to the submission of false claims, insufficient detail has been pled to satisfy the requirement of Rule 9(b), Relator respectfully asks that the Court grant an opportunity to amend the Complaint.  The Sixth Circuit has recognized that a plaintiff facing dismissal pursuant to Rule 9(b) should be permitted to cure her pleading.  Bledsoe v. Cmty Health Sys., 342 F. 3d  634 (6th Cir. 2003) at 651. While Relator does not anticipate that amendment will be necessary, in the event the Court finds insufficient factual basis for the claims alleged, Relator urges that the Court should exercise its discretion in favor of allowing an amendment.

### IV.  THE COMPLAINT PROPERLY PLEADS THAT OMNICARE'S SWAPPING CONTRACTS RESULTED IN THE SUBMISSION OF FALSE CLAIMS TO STATE MEDICAID PROGRAMS

Defendant's "best price" argument is designed to draw the Court's attention away from Relator's fundamental allegations: Omnicare offered illegal bribes to SNFs in to induce them to provide Omnicare with their non-Medicare Part A business, including Medicaid. (*See* Section II above).  The Complaint properly sets forth causes of action as to all federal reimbursement claims tainted by Defendant's kickback scheme. Counts V and VI, which are based on Medicaid violations, are not only viable because Omnicare violated Medicaid's "best price" allegations, but also because the claims were fraudulent *ab initio*.  But for the illegal kickback scheme, Omnicare would have had no claims for which to seek reimbursement from Medicaid, as its ability to do so was the direct result of its illegal kickback scheme.  Thus, for Relator's Medicaid-based claims to survive it is unnecessary for Relator to plead a comparative "apples to apples" analysis of the bribe rates to its

- 23 -

Medicaid rates, as contemplated by the court in <u>Omnicare Respiratory Services</u>, 2010 Ohio 625, *supra*, or that Omnicare was required to offer Medicaid its best price.

Although not required to do so, Relator goes beyond what he must plead and additionally alleges that Omnicare violated state "best price" rules.  Counts V and VI thus allege the federal reimbursement of Medicaid claims was *additionally* false as a result of Omnicare's failure to provide Medicaid its best price. Relator alleges that Omnicare's own employees informed Relator they believed Omnicare's Medicaid claims violated the best pricing rules in effect in various states, and that a customer had confronted Omnicare about it as well. *See, e.g.,* Compl., ¶¶ 33, 37, 38, 41. Additionally, in arguing that no "best price" requirement exists under Ohio law, Defendant conveniently ignores O.A.C. § 5101:3-1-29 ("Medicaid fraud, waste, and abuse"), which provides that "[c]ases of provider fraud, waste, and abuse may include . . . [d]iffering charges for the same services to Medicaid and non-Medicaid consumers." This is the exact conduct the Complaint alleges: Omnicare routinely billed Medicaid an amount that exceeded—dramatically—the per diem amounts it charged SNFs for their Medicare Part A patients for the same patient and drug mix. Ohio's legislature thus identified discrepancies between Medicaid and non-Medicaid prices as a conspicuous badge of fraud.

Omnicare also conveniently ignores the fact that the Complaint alleges not only violations of Ohio law, but also violations of the laws of "the various States" that also have "best price" requirements. Compl., ¶¶ 42, 45, 64, 66. It is indisputable, for example, that the California Code of Regulations contains a "best price" requirement: ***[N]o provider shall charge [California Medicaid] for any service or any article more than would have been charged for the same service or article to other purchasers of comparable services or articles under comparable circumstances*** . . . . Title 22, Div. 3, Sub. 1, Chap. 3; 22 CCR 51501(A) (2012). The Complaint's allegations that Omnicare submitted claims to Medicaid that exceeded the amount it charged non-Medicaid

providers for the same drugs set forth a clear violation of California's (as well as Ohio's) best price requirement.[14]

Notwithstanding Omnicare's charge that Relator makes a "flawed comparison" of Part A and Medicaid pricing, Doc. 28 at 19, the Complaint adequately alleges that Omnicare's discounted prices for its SNF customers' Part A residents were in fact lower than the prices paid by Medicaid for the same services.  The prices alleged in the Complaint are derived from Omnicare's own records which tracked all pricing on a monthly basis as well as routinely compared Omnicare's *per diem* prices with those charged to Medicaid, and other purchasers.  Moreover, the Complaint's allegations that Omnicare's per *diem prices* are adjusted for patient population and drug mix, establish that prices paid by Omnicare's different purchasers may readily be compared.  Compl., ¶ 24.  To the extent the Relator's pricing comparison can be said to have not already satisfied the "apples to apples" standard of <u>Omnicare Respiratory Services</u>, 2010 Ohio 625, Relator should have the benefit of discovery through which to present a more rigorous comparison, just as the plaintiff was permitted to attempt in that action.

## CONCLUSION

The Motion to Dismiss should be denied in all its particulars.

Respectfully Submitted,

*/s/Frederick M. Morgan, Jr.*
FREDERICK M. MORGAN, JR. (OH 0027687)
JENNIFER M. VERKAMP (OH 0067198)
MORGAN VERKAMP, LLC
700 Walnut Street, Suite 400
Cincinnati, Ohio 45202

---

[14] Omnicare's attempt to split hairs between "charges" and "reimbursements" (Doc. 28 at 19) is in vain.  Upon application of a Medicaid most favored customer obligation, whatever Medicaid's "reimbursement rate" may have previously been for a given service, the amount to be paid by Medicaid should be reduced to the lower rate paid by non-Medicaid purchases for the same service.  Whether Medicaid's payment of this reduced price is referred to as a "charge," "reimbursement" or  other descriptive terminology, is a matter of semantics.  That the California statute explicitly refers to improper "charges" confirms that Omnicare's distinction is meaningless.

513-651-4400
513-651-4405 (fax)
rick.morgan@morganverkamp.com
jverkamp@morganverkamp.com

ROSS B. BROOKS (NY 3001146) (admitted *pro hac vice*)
MILBERG LLP
One Pennsylvania Plaza, 49th Floor
New York, New York 10119
212-946-9465
212-868-1229 (fax)
rbrooks@milberg.com

VIRGINIA A. DAVIDSON (OH 0025773)
ERIC S. ZELL (OH 0084318)
CALFEE, HALTER & GRISWOLD LLP
1405 East Sixth Street
Cleveland, Ohio 44114
216-622-8200
216-241-0816 (fax)
vdavidson@calfee.com
ezell@calfee.com

*Attorneys for Plaintiff-Relator Donald Gale*

## LOCAL RULE 7.1(f) CERTIFICATION

The undersigned hereby certifies that this case has not yet been assigned to a track and that this Memorandum complies with the page limitations set by the Court's February 22, 2012 Order granting Motion to exceed page limitations

*/s/Frederick M. Morgan, Jr.*
*Frederick M. Morgan, Jr.* (OH 0027687)
*Morgan Verkamp, LLC*


## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing was filed electronically this 30th day of March, 2012, with the U.S. District Court for the Northern District of Ohio. Notice of this filing will be sent via electronic mail to all parties who have entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's ECF system. A copy of the foregoing will also be served upon the United States pursuant to 31 U.S.C. § 3730(c)(3).

*/s/Frederick M. Morgan, Jr.*
*One of the Attorneys for Plaintiff-Relator*